Uvino v. Harleysville. Good morning, your honors. May it please the court. My name is William Dayhill from the firm of Wolmuth, Marr & Deutsch, and I'm here on behalf of the appellant, the Uvinos, who are also cross appellees in this case. The primary issue before the court from the appellant's perspective was the district court's error in its March 4, 2015 order, which put the burden of allocating the judgment obtained by the Uvinos below and putting that burden on the Uvinos. This was an error because the Harleysville, the appellee here, failed to notify its insured of its need, its insured's need, to allocate the judgment in order to obtain coverage, which is contrary to the position it now takes. But the Harleysville attempted to intervene in the EDNY action, right, in order to explain to the court and to the parties that needed the jury to answer special interrogatories in order to establish coverage. It explained what the problem was and that it needed to allocate and that would affect the coverage resolution. What more should it have done? Your honor, if you look at the representations made to the court, they were a little bit different than what you just said. The representations that they made to the court, both in a letter requesting a motion to intervene, in its motion to intervene, and importantly, in its reply to its motion, in support of its motion to intervene, said that it sought to intervene so that it could avoid the necessity of a second proceeding. That is what the representation was that was made to the court. I'm reading, it said, permitted to intervene for the limited purpose of proposing special jury interrogatories. The factual issue is the extent to which there are any damages to property other than Barrow's work. Here's the position that will be, you know, coverage will be affected by that determination. And so that, this is an important determination. And I think it makes very clear why it needs to participate insofar as it wants to propose special interrogatories. Because you're, I'm not sure which of the statements. I'm sorry, I was just reading from the September 14, 2011 letter. Yes, your honor. And so that letter goes on to say that an allocation is necessary to reduce the insured's uncovered exposure and to avoid an entirely separate and redundant trial to allocate such damages. That is the portion which the record reflects and Judge Buchwald noted that was relied upon expressly by its insured in arguing against proceeding with having a specific special interrogatory proffered. In its opposition to the motion to intervene, JBI stated specifically two things which are relevant here to understanding what the parties were thinking at the time. One of which is, and I didn't represent JBI. JBI represents the Uvinos who now stand in the shoes of JBI. JBI said in a long list of things in opposing that motion stated among other things that the lack of intervention wouldn't prejudice Harleysville because they could later adjudicate coverage. And importantly, Mr. Barrows, who was the principal of JBI, stated in an affidavit that he didn't want to have the allocation or the special interrogatories proffered because he was concerned it would interfere with his ability to make his presentation of the case to a jury and specifically said, I'm not concerned about the cost of litigating a separate coverage issue. So your honor, what I would proffer is that while there was a request made without question to intervene, the question is how was the request proffered and what was put to both, not only Mr. Barrows, but also to Judge Wexler when he made decisions ultimately in this case, which I would argue were made for the, in his view, to benefit the, he was technically the plaintiff in this case, the general contractor. The Uvinos had a counterclaim, which is what we prevailed on. But your honor, that's what the issue here is, whether or not that disclosure, that request, was clear, told the parties and the court what was going to happen. What's happened here is there was a judgment obtained after the motion was denied for intervention. We appeared later to claim coverage . . . And the judgment was obtained on a contract theory? The contract theory, your honor, was the broad, was the name of the claim that was in the The theory that the JBI had committed torts in its relationship by damaging the work of the third party contractors, that was not a theory preceded on, isn't that correct? Your honor, there was absolutely evidence presented throughout the entire trial. That was the, as the court below noted, and by the way, as the claim notes of Harleysville noted, is that while the claim is denominated as contract, there's a broader range of conduct that's covered within the claims. And so in fact, there was evidence presented below to the jury of the exact conduct for which we claim coverage exists, specifically as three examples that we've used are with regard to a stair tower, the framing, and the interiors of the home. So there was that evidence was presented. That was what was actually presented to the jury. And the court, the court below, excuse me, noted in its ruling that, and we have all the cases that are cited, that it's not just the name of the cause of action. It is also what was actually presented. What are the facts? And one thing we agree upon with Harleysville is what was the actual basis of the determination? And here, the evidence submitted to the jury included the conduct that I just described. Your, your, I think your, your argument, your theory on shifting the burden is that, um, the insurance company had a, uh, a duty to advise its insured of the, the, of its interest in, in, uh, special interrogatories. Yes, Your Honor. But everyone knew what the issues were. Um, it seems to me, I mean, what, what advice had to be given, um, because of the motion to intervene all of, I mean, the JBI was fully aware of at least the insurance company's position that it would make sense to have special interrogatories. It doesn't seem to further the purpose of shifting the burden is what I'm suggesting. Your Honor, had the, had the, had the application for the motion or the support of the motion said if there's no allocation of, of the judgment, you will be faced with a, with a potential no coverage circumstance because if we are unable to determine it with some level of clarity, what exactly happened, we will disclaim coverage. That's precisely what has happened. But that's not what they said. Yes, that is exactly what happened. But what we're saying is that it's not what they said at the time when they, when they made the request. Instead, they said we will have a set, we'll be forced to have a separate proceeding. And Mr. Barrows, the insured said, I don't care. I will have a separate proceeding. I don't want this now. He didn't say, I don't care. I don't want coverage. He said, I don't care. I want to have, I'll, I'm prepared to have a separate proceeding if need be. Okay. I'll hear from the other side. Thank you. Good morning and may it please the court. Lance Kalick representing the Appalachee-Harleysville-Worcester Insurance Company. New York law, and I don't think this is really challenged, puts the insured to bring a claim within coverage. We don't see any authority in New York to shift the burden. And I know that's what's being argued here. But this is not the case if there was a legal authority to do it where it should be done. We, on at least five separate occasions, our client, both by itself and through counsel, advised JBI specifically of the coverage issues here and the fact that there was a likelihood of a substantial uninsured verdict here, either entirely, which is what our position is on our cross appeal, or predominantly, which is I think even conceded that far more uncovered damages were presented to the jury than covered damage, potentially covered damages. And so we advised the insured when we initially agreed to defend them, and we defended them for years, spending a quarter million dollars. We advised the insured at the close of discovery that we are not providing coverage for faulty workmanship, for damages associated with faulty workmanship, and you face a substantial uninsured exposure, you should consult with personal counsel. And JBI did. We at Harleysville hired a separate lawyer, me, to go in and seek intervention because it didn't want its defense counsel at the time, its assigned defense counsel, to be making arguments, allocating damages, because it wasn't for Harleysville to decide on behalf of the insured how best to protect the insurer's uninsured exposure. That was the job of JBI's own lawyer. It may have been a strategic decision for JBI's lawyer to not allocate damages and to not allocate damages for the insured exposure. I know it's the Uvino stepping into their shoes. The lawyer for JBI may have reasonably said, hmm, I'm facing a very large uninsured exposure and a very small covered exposure. It may be best for my client not to allocate damages because perhaps the claims for the covered exposure are that there's worse defenses for those than there are for the uncovered, and I may be able to color this and reduce the verdict or get a no cause if I don't allocate damages. In fact, defense lawyers often don't want to have separate lines for damages because they're worried about enhanced damages. So they may have made a very strategic decision to do exactly what they did, and it's not for the insurance company to decide for the insured how best to proceed. All our obligation is to tell them what our position is and what we plan to do and not cover a significant portion of damages and why. And we did that five occasions. The ROR letter at the beginning, the ROR letter at the end of discovery, a letter to the court advising that we seek to intervene, the actual intervention motion, and then we actually wrote a letter to the personal counsel, and this is at A749 and 750, explaining exactly what our position was and that it was his job at the trial, he was personal counsel, to proceed how he thought best to protect his client's uninsured exposure, which was significant. To preserve coverage, did he need to denominate some elements of the theory of recovery as tort claims as opposed to contract claims? Can we look past the labels and look at the kind of findings the jury made or the evidence that was presented to the jury in helping to determine coverage, or does the fact that it looks to have been prosecuted and presented the jury as purely a contract matter, does that resolve the coverage dispute for all time? I think that's case specific. I think in this case, because all of the damages were for faulty workmanship of this insured under their construction management agreement and their separate trade agreements, I don't think there was any third-party damage to a neighbor's house, to a car, to the insured's personal property . . . to the Uvena's personal property. Or to the subcontractor's work. Yes, but there may be situations where the label is not sufficient and you do have to look at the damages. There was an option, by the way, for JBI in the underlying case to both have its cake and eat it too, so to speak. It certainly could have asked the judge, listen, I don't want this influencing the main verdict, but can we do supplemental after the initial verdict and we find a total damage amount? You have a bifurcated verdict. Yes. Can we separate out the damages at that point, if there is a verdict, so that my client knows exactly what the jury found and what they did? And I think what happened . . . They didn't seek that. They did not seek that. And we were not allowed to participate in the trial, in the proceeding. I think the district court in this case got it exactly right. There is no way at this stage to ferret out what was covered and what was uncovered. And I've done this. You can go through the exhibits that were presented to the jury a million times and spend a lot of time trying to figure out, and there's just no way to match up the damages that the jury ultimately awarded with any discrete items of damages in the three different exhibits that the Uvinas presented to the jury. And when the presentation was made to the trial court, we responded with different sets of damages that got even closer to what the jury ultimately did than what they were presenting. So our argument was that any fact finder here would be asked to speculate exactly what comprised that approximately $405,000 verdict. And if we were to have a separate trial, it actually might be inconsistent with what the first jury did because the first jury may have been assessing damages on the delay, which is clearly not covered, on the delay damages, the interest, or the cost overruns, which were substantial here. If you had such a trial, the Uvinas, or whoever had the burden, would have to prove that the jury's verdict of $400,000 or so, X was for covered damages and Y was for uncovered damages. That's correct. They would have to meet their burden to show that at least there was a reasonable possibility that the $405,000 represented coverage. What the jury, and to prove it, you'd have to look at the evidence of what the jury saw in terms of, I mean, in other words, would a second jury be deciding what the first jury was thinking? Absolutely. That's what the task would be. And I think in the best circumstances, that's problematic, but I think if you had appropriate damage exhibits that matched up with verdicts, it's possible to be done. Clearly, the preferable method would be to have a supplemental proceeding in the first case. The jury could say what it was thinking. Absolutely. Absolutely. Unless there's further questions on the appeal, I just want to spend a minute on the cross appeal, if I may. Our client's position is that none of this is covered, that Fuller represents the state of the law in New York, and that a construction manager, even when they do side jobs pursuant to other trade contracts, that the entire project is the work of the construction manager. And we believe that the district court erroneously relied on a decision from this court that is not New York law. And we believe that none of this was covered, but we certainly request that this court affirm the judgment below for either reason. Thank you. Thank you. We'll hear the rebuttal. Thank you, Your Honor. I have a number of things I'll try to buzz through rather quickly. Let me ask you this. Yes, Your Honor. What damages that the jury awarded were covered? Your Honor, of the $1.9 million worth of damages that were presented to the jury . . . Of the . . . I understand . . . What was presented. No, no, I . . . The jury awarded $317,000 in general damages, $87,000 in consequential damages. Is any of that covered under the policy? Your Honor, as we presented to the court below in the second round of briefing, we believe all of it's covered, and it's laid out in detail to the court below, and it wasn't room to do it here, but I'll do it very, very quickly. And these are things that could have been presented to and determined by a fact finder. Number one, you can exclude . . . certain damages could be excluded because if you start with the $1.9 million that were submitted, as evidence demonstrates that there was only one change order that was the subject of recovery because it was specifically in a breach of fiduciary duty action. That removes . . . Well, of something that would be covered. The damage to the stair tower. There were contractors hired to install a stair tower. There was a problem with the stair tower. Mr. Barrows, as JBI, went up and installed . . . Why isn't that faulty workmanship? Because he wasn't hired to do that. He was not a contractor. He had a separate trade contract to do specific work. As a construction manager, the Uvinos hired Tebben Steel to do the work on the stair tower. They hired Radian Drywall to do the work on the interior. They hired . . . That would be faulty workmanship on the part of the subcontractor. No, it would be . . . it is not faulty work on part of the subcontractors. The stair tower is the perfect example. He went in and . . . there's evidence that was put into the . . . there was expert report. There was testimony that Mr. Barrows went in and put in what was called a cricket on the roof of somebody else installed. His effort to do some work outside the scope of his contract that impacted the stair tower, which then caused a leak. And it cost . . . and the dollars and the monies that were ascribed to that were part of what was presented to the jury. That's just one example. So finish up . . . I'm sorry, Your Honor. The one thing I was going to say very quickly is that . . . and this actually goes into much of what I was going to say is that there were significant questions of fact as to what . . . you know, there was a representation made that we concede that there was far more uncovered than covered damages. That's not true. That's a different of interpretation that they're taking of evidence that was put to the juries compared to what our view is. And there's a record that could be put before other people to determine what was the nature of what these damages were. And finally, I want to put very quickly on the idea of the Fuller case. The Fuller case is not a case that's on point here. The Fuller case is grounded in the fact that they were primarily a general contractor and indeed a lot of the damages were for . . . done by a trade that Fuller itself had hired. Mr. Barrows did not have that relationship with anybody here. Thank you, Your Honor. Thank you. We'll reserve decision.